Mr. Duffy, good morning. May it please the court, I'm Peter Duffy. I represent the appellant Franceli Sanchez Londono. I'd ask the court if I could reserve one minute of my time. You may. Thank you, Judge. We appeal from the district court's decision denying the mother's petition for the return of the child, Elizabeth, to Columbia. The Hague Convention is based on the principle that the child's best interests are served well when decisions regarding custody are made in the country of the child's habitual residence. Now, Columbia is a signatory to the Hague Convention. While sometimes Columbia may be subject to some negative stereotypes, there are many beautiful things about Columbia. And one of those things in this case is that Columbia is the home of the child's mother. The father has not alleged any grave risk of harm for returning the child to Columbia. Now, all things being equal, we may be inclined to prefer that a child be raised in the United States. That may be preferable. But all things are not equal in this case, because here the mother's residence is in Columbia. Now, on this appeal, it's the mother's position that the district court committed legal error. The district court rested its decision on the legal conclusion that Elizabeth's habitual residence, as of December 2011, could be deemed the United States. The district court, however, did not first determine whether Elizabeth's habitual residence had become Columbia during the two and a half years that Elizabeth lived in Columbia. Before the lower court could determine habitual residence in December of 2011, we would submit that the district court needed to determine, as part of its legal analysis, whether the habitual residence had become Columbia before that. Excuse me. Not if the habitual residence that the parties had originally established in the United States had never been abandoned. I mean, it's undisputed that there was a habitual residence in the United States. The parties met. The parties married. They did, Judge. All right? And I don't see anything in the record, open to enlightenment, that indicates to me that that habitual residence was ever abandoned. I understand the mother went to Columbia, but she went there as part of an effort to legitimate her status in the United States so she could come back and stay without the cloud of being an undocumented alien. Certainly, Judge. When the mother initially went to Columbia, the plan was that the mother would regularize her immigration status and soon be permitted lawful entry into the United States. So, therefore, at that time, there was no abandonment by the couple of the habitual residence in the United States. Correct, Judge. I would agree with that. At that point, when she went to Columbia. And when do you say that habitual residence was abandoned? During the two and a half years that the mother and the child resided in Columbia. Day after day, the child woke up in Columbia. The child began to attend school in Columbia. The child was living with her grandmother and her stepsister in Columbia. So, that sounds to me like an argument that habitual residence can be abandoned purely by acclimatization, even though the settled purpose of the parents of a very young child hasn't been altered. Well, Judge, what happened here, though, was the parents, every day, they expressly or implicitly agreed that that child would live in Columbia. Temporarily pending the mother's efforts to get back into the United States. The parents never at any time agreed that the family's permanent place of residence or place of habitual residence would be Columbia. Judge. That's what I'm struggling with the notion of you've agreed that there was a habitual residence in the United States. And I'm struggling with the notion of when and how that habitual residence dissolved or got changed, because I don't see in the record any evidence that the parents ever agreed on any other place of habitual residence. Yes, they agreed on a place of temporary residence pending the mother's efforts to come back. Judge, Darren acknowledges that what was originally intended to be a temporary stay may evolve into something more, may evolve into habitual residence. That's true. Here what we have is we have every day for two and a half years, father and mother expressly or implicitly agreed on Elizabeth being in Columbia. Father never asked for Elizabeth's return. He only came to see Elizabeth once in Columbia. What happened, Judge, was the parties at that point in time merely had hopes and aspirations that mother might be able to come back to the United States with Elizabeth. I would submit that the district court confused what intentions, described as intentions, what were really just hopes, dreams, and aspirations. But the mother was not. Yes, Your Honor. Well, just here you have a different situation, right? Because the district judge found no abandonment, didn't he? The district court made a finding that the parties did not intend to abandon the United States. And how do we review that? You need to look at that, Judge, with respect to the point in time. I mean the standard, the standard. Oh, the standard. Your Honor, I submit that this court reviews these matters under a de novo standard of review. But that's not so. Our recent decision in Darren makes it very clear that factual findings of that sort are reviewed for clear error. Well, Judge, even if you were to apply a clear error standard on that issue, I would submit that the error is this. The judge described as intentions what were really hopes and aspirations. They weren't really intentions. The mother was beyond her control on whether she would be allowed lawful entry into the United States. They wanted lawful entry into the United States, but it was short of an intention. Judge, there are people all around the world who want to bring their children to the United States. They have hopes and dreams to have their children come to this great country. But that cannot possibly mean that their children can be abducted to the United States without a remedy. No, no. But that completely overlooks the single most significant fact in this case, which is that these parents had established a habitual residence in the United States, and there has to be an affirmative finding of abandonment. The fact that one parent leaves the country temporarily intending to return, granted if she's able to do it, doesn't change or abandon that habitual residence. Now, there could have come a point where the parents agreed that return was futile and could have agreed to keep the child in Columbia, but I don't see any evidence that that ever occurred. Well, Judge, here's what happened. I mean, it was what was occurring. For two and a half years, the child was living in Columbia, started school in Columbia, was involved in a church in Columbia, and the father did absolutely nothing. But that's an argument that acclimatization can overcome habitual residence, and the case law is just dead against you on that. But I got one more point on this, Judge. The only thing that suddenly changed after two and a half years was that father perpetrated a fraud against the mother. He engaged in a scheme to have the mother entrust the child to him and allow him to bring the child to the United States. I understand your argument, but that's bootstrapping, because if the habitual residence was the United States and that had not been changed by the time when the father committed what you allege to have been deceit, all right, the deceit by itself couldn't have changed it. The deceit may have affected why the mother agreed to let the child go, but my question goes back further than that. You've got to show an abandonment of the habitual residence that was formed, and I'm struggling to see, first, I'm struggling to see how the district court could have found for you. I'm struggling even more to see how we can say that it's clear error for the district court to have found against you. Judge, if this had gone on for a month, this residency in Columbia, a month, two months, then the father began to ask for the return of the child. You've finished your sentence. Oh. That would be a different scenario, but what we have here is two and a half years, day after day, the parties expressly and implicitly agreeing that the child could remain in Columbia, would go to school in Columbia, would have friends and activities in a church in Columbia. It's a far different scenario. But all of this is taking place with the idea that eventually she would return to the United States. As a hope, dream, and aspiration, Judge, but not an affirmative plan would submit. It was beyond their control whether she would be allowed entry, and this was the mom who had been the primary caregiver during the first two years of the child's life. You're sort of arguing that the father implicitly agreed that Columbia should make custody decisions with respect to that child in the future. That's sort of your argument, isn't it? There's not much evidence of that. That Columbia would be the child's home. No, that Columbia would make the decisions with respect to custody of this child. Ultimately, yes, Judge. There's nothing in the record that suggests the father ever agreed to any such thing, right? There is the father's day-to-day acquiescence in the established residency in Columbia, Judge. Thank you. Thank you. Good morning. Good morning. May it please the Court, Stephen Cullen for the respondent, Nelson Gonzalez. Your Honors, as you know from the record, everyone is now here in America. The mother is here on humanitarian parole, and as you know the case is advancing in the probate court in Massachusetts. How does that affect the question of what was the party's habitual residence at the time the child was taken to the United States and whether the original habitual residence was ever abandoned? Does that have any bearing on those questions? Yes, it does, Your Honor. How? It confirms intent, and the intent has always been that the child lives in the United States, and the intent has always been that the child's habitual residence is here, and that the mother herself, remember, only went back to Columbia after a police stop, and the police stop caused agitation, understandably, in the family, and the shared plan was for the mother to go back temporarily until she normalized her immigration arrangements. The child went back with her temporarily, and then the mother put the child and the father back on the plane to America when the father went down to pick the child up, and not only pick that child up, but also to pick up the mother's other daughter from another relationship. With respect to the district court's finding, I believe it's paragraph 27 on page A63, I believe it is, Your Honors. There's a clear, unequivocal finding by the district court that there was never a plan for the child to remain in Columbia, ever, and that finding would be subject to the new, clearly erroneous standard established in the very recent Darin case. The other issue Your Honors raised was one of acclimatization a few moments ago, and all I would like to say about that is that, again, Darin says very clearly that you only look to the evidence of acclimatization in the event that there are contrary parental intentions, and here, from the day this child was born in America, the plan has always been shared, and the plan has always been that the child resides here. Your Honors, unless you have anything further? Is there any objection in the Massachusetts State Probate Court to the court's jurisdiction over this child to determine custody? Is there any objection by either party? No. Both parties have proceeded, as you saw from the motion to dismiss that we filed, the case is ongoing right now in probate court, and Ms. Sanchez is here with a valid visa to litigate that case for as long as it takes in probate court. Thank you. Counsel, you have one minute. Thank you, Judge. Actually, just to clarify the record, there is no probate court proceedings pending currently. We actually had filed a motion to vacate the divorce judgment based on the father's fraud. The probate court denied the motion to vacate, but there is no currently pending probate court proceeding. Further, the probate court proceedings were not with respect to any permanent custody arrangements. In the probate court proceedings, we merely sought that the court would enter temporary orders pending the resolution of the Hague Convention proceedings. So there's nothing pending. Is any of this in the record? It is in the record with respect to the motion to dismiss filed by the appellee, but it's not in the record from the lower court, Judge. There is a motion to dismiss before this court, and the issue is briefed there. Thank you.